**LOUISVILLE AND NASHVILLE RAILROAD COMPANY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

**No. 78–1303.**

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1980.

Decided Feb. 16, 1981.

Rehearing Denied March 31, 1981.

George K. Dunham, Jacksonville, Fla., Joseph L. Lenihan, Louisville, Ky., for petitioner-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Tax Div., U. S. Dept. of Justice, Gary Allen, Karl Fryzel, Stuart E. Seigel, Chief Counsel, Washington, D. C., for respondent-appellee.

Before BOYCE F. MARTIN, Jr., Circuit Judge, and CELEBREZZE and PHILLIPS, Senior Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Louisville and Nashville Railroad Company (L&N) appeals from a Tax Court decision upholding the Commissioner's assessment of tax deficiencies for the years 1955–1964. 66 T.C. 962 (1976). In dispute are five issues. (1) Under the "retirement-replacement-betterment" method of accounting, the salvage value of "relay" (reusable) rail must be based upon fair market value instead of book value. (2) Certain overhead costs associated with the building and rebuilding of freight cars must be capitalized rather than deducted as current operating expenses. These overheads include: fringe benefit costs incurred on behalf of employees in the rebuilding program, payroll taxes under the Railroad Retirement Tax Act, and the "deadhaul" cost of transporting building materials on the taxpayer's own freight line. (3) Pursuant to Internal Revenue Code § 481, the court ordered a "year of change" adjustment in conjunction with the capitalization of overheads. (4) In its opinion of September 9, 1976, the court found as a fact that L&N had rebuilt 1,966 freight cars in 1964. More than a year later, at the Rule 155 computation hearing, the court entertained and, over L&N's objection, adopted the Commissioner's conten-

tion that L&N had actually rebuilt 3,620 cars in 1964. (5) Retirement deductions for grading and ballast characterized by L&N as "abandoned" were disallowed.

L&N makes the following allegations of error: (1) that the Commissioner's formula for determining salvage value was improper and that L&N's accounting method, required under Interstate Commerce Commission regulations, was presumptively acceptable for tax purposes; (2) that overhead costs, particularly payroll taxes, are deductible; (3) that no "year of change" adjustment was warranted; (4) that the court's revision of its original findings of fact constituted an abuse of discretion; and (5) that there was insufficient evidence to support the court's holding that certain grading and ballast continued to benefit the taxpayer.

## I. Salvage Valuation of Relay Rail

█ As part of its Uniform System of Accounts for Railroad Companies, the Interstate Commerce Commission requires railroads to use the "retirement-replacement-betterment" method of cost accounting. Under Internal Revenue Code § 167(a), as interpreted by Revenue Ruling 67–145, 167–1 C.B. 54 and Revenue Procedure 68–46, 1968–2 C.B. 961, railroads may also use this method to calculate deductions allowable for cost recovery on their tracks.

The retirement-replacement-betterment system simplifies depreciation reserve accounting by treating a section of railroad track as a single, indivisible asset. The track is carried on the railroad's books at its historical cost; no depreciation is taken or deductions claimed until the track is physically removed. At the time of removal, one of three possible events occurs: the section of track may be "retired" from service altogether; the removed rail may be "replaced" with rail of like kind, as when 80-pound rail is replaced by 80-pound rail; or the section may be "bettered" if, for example, 80-pound rail is replaced by 100-pound rail.

These alternatives result in different tax consequences. If track is retired, its historical cost, reduced by its salvage value, is deducted as current operating expense. If track is replaced in kind, the cost of the replacement, less the salvage value of the rail removed, is expensed. If a betterment occurs, the prorated cost attributable to the betterment is capitalized and the balance, reduced by the salvage value of the rail removed, is deducted.

The condition of rail at the time of its removal determines its disposition. "Scrap" rail is suitable only for sale as scrap metal; its salvage value is, therefore, easily ascertained. "Relay" rail, on the other hand, if it is in sufficiently good condition may be reused ("relaid") in another section of track. It is the salvage valuation, for tax purposes, of relay rail which concerns us here.

Relay rail removed between 1955 and 1964 was carried on L&N's books at $40.00 per net ton. This $40.00 salvage value figure was also used for tax purposes. Thus, as the taxpayer replaced sections of rail, its replacement deductions, based on current costs, were reduced only to the extent of the "book" salvage value of the relay rail removed. In consequence, the Tax Court held, rail replacement deductions claimed by L&N were excessive. In order to reflect the taxpayer's income more accurately, the court ruled that the salvage value assigned to relay rail should approximate its current fair market value. According to the Service's recomputations, adopted by the court, "fair market value" is equal to one-half the sum of new rail replacement cost and the actual market price of scrap rail.

On appeal, L&N offers two arguments for reversal. First, it asserts that the retirement-replacement-betterment method of accounting is required by the Interstate Commerce Commission and is, therefore, in use throughout the industry. We are asked to infer from this circumstance that the accounting system does in fact accurately reflect income. Second, L&N points out that the Service raised the relay rail issue for the years 1955–1963 in its amended answer, thereby assuming the burden of proving the propriety of its recomputations. According to the taxpayer, the Commissioner failed to sustain this burden.

Before reaching the merits of the taxpayer's arguments, we recapitulate briefly our position on the scope of appellate review. L&N invites us to avoid the strictures of F.R.C.P. 52(a) by interpreting the Tax Court's ruling on this issue as one of law, or "ultimate fact." Despite some authority for that approach in other circuits, we remain convinced that the findings below are factual in nature and therefore subject to the "clearly erroneous" standard of review. In so deciding, we reaffirm our adherence to the views we have expressed in recent cases. *See Case, et al. v. United States*, 633 F.2d 1240 (6th Cir., 1980); *Gartrell v. United States*, 619 F.2d 1150 (6th Cir. 1980); *Philhall v. United States*, 546 F.2d 210 (6th Cir. 1976).

### A. The Mandatory nature of the taxpayer's accounting method.

L&N argues that courts should accord considerable weight to the fact that the Interstate Commerce Commission requires railroads to use the accounting method which yielded the disputed tax consequences.

In *Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15, 94 S.Ct. 2757, 2765, 41 L.Ed.2d 535 (1974), the Supreme Court noted:

Although agency imposed compulsory accounting practices do not necessarily dictate tax consequences, *Old Colony Ry. Co. v. Commissioner*, 284 U.S. 552, 562, 52 S.Ct. 211, 214, 76 L.Ed. 484 . . . they are not irrelevant and may be accorded some significance . . . . Nonetheless, where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency *and* that method *clearly reflects income*, it is almost presumptively controlling of federal income tax consequences. (emphasis added)

*See also Commissioner v. Seagram & Sons*, 394 F.2d 738, 741 (2d Cir. 1968).

Thus, operation of the presumption sought by L&N is conditioned upon a finding that the accounting method at issue "clearly reflects income." No such finding exists here. On the contrary, in keeping with the broad discretion he enjoys under Internal Revenue Code § 446(b), the Commissioner has determined that one aspect of "retirement-replacement-betterment" accounting does *not* clearly reflect income. The Tax Court upheld that conclusion. We have seen no legal basis on which to disagree.

### B. Whether the Commissioner has shown that retirement-replacement-betterment accounting does not "clearly reflect income."

L&N points out that the Commissioner must demonstrate that the disputed accounting practice does not "clearly reflect income." Failure to do so would mandate a reversal of the decision below, since "the Commissioner does not have the authority to change from a method of accounting which *does* clearly reflect income to a method which, in the Commissioner's opinion, *more* clearly reflects income." (emphasis added). *Auburn Packing Company, Inc. v. Commissioner*, 60 T.C. 794, 800 (1973); *see also Thompson-King-Tate, Inc. v. United States*, 296 F.2d 290, 294 (6th Cir. 1961). Our central inquiry, therefore, must be whether the Commissioner has sustained his burden of proof. We believe that he has.

Conventional depreciation reserve accounting and the retirement-replacement-betterment method present significant mechanical differences. They share, however, the common purpose of permitting tax-free recovery of the cost of certain business assets. Internal Revenue Code § 167; *see Boston & Maine R. R. v. Commissioner*, 206 F.2d 617 (1st Cir. 1953). The ratable depreciation model, which spreads a taxpayer's actual investment in an asset over the asset's expected useful life, fulfills its purpose of cost recovery without generating untaxed "income;" in other words, it "clearly reflects income." *Massey Motors v. United States*, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960); *Hertz Corp. v. United States*, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960); *United States v. Chicago, Burlington & Quincy R. Co.*, 455 F.2d 993 (Ct.Cl., 1972), *rev'd on other grounds*, 412 U.S. 401, 93 S.Ct. 2169, 37 L.Ed.2d 30 (1973). Alter-

native methods of cost recovery, such as the retirement system, must achieve a comparable result. As the Tax Court observed in *Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352, 364 (1975):

> The ultimate justification of (the retirement method's) use is that, through the aggregate yearly deductions from the annual retirements, replacements, and maintenance, the railroads will, in the course of an established and ongoing business, recoup their capital investment, and that is the rough equivalent of depreciation.

As we noted earlier, when the taxpayer computed its rail replacement deductions it used book value of $40.00 per net ton as the salvage value of relay rail. During the years in question, however, the average market price of *scrap* rail was $44.00 per net ton. It is undisputed that relay rail is of more value to the taxpayer than scrap rail; the "book value" of relay rail simply does not reflect economic reality. On the other hand, L&N bases its deductions for rail replacement on actual current costs. The net effect of offsetting actual costs with understated salvage value is, of course, the overstatement of deductions and the understatement of income. This is particularly true during an inflationary period when replacement costs rise rapidly but "book" salvage value may remain constant. *See Chicago, Burlington & Quincy R. Co., supra.* It is apparent that the taxpayer's practice of using book salvage value for tax purposes does not "clearly reflect income."

In response, L&N contends that the Commissioner has failed to show affirmatively that the formula devised to correct the income distortion *does* constitute a "reasonable allowance for wear and tear." This argument ignores the Commissioner's broad discretion to correct inaccurate accounting practices. If he can show, as he has done here, that a method fails "clearly to reflect income," he may substitute any system which does not produce arbitrary results. *See Thor Power Tool v. Commissioner*, 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979). The Commissioner's recomputation, based on one-half the sum of new rail and scrap rail prices, is reflective of current market values. As such, we believe it to be inherently reasonable. *See United States v. St. Louis-San Francisco Ry. Co.*, 537 F.2d 312, 313–316 (8th Cir. 1976).

Had L&N introduced evidence that the recomputed salvage value of relay rail was excessive, it might have prevailed. *See Chesapeake & Ohio Ry. Co. v. Commissioner*, 64 T.C. 352 (1975). Inasmuch as it failed to do so, however, we cannot say that the Tax Court was clearly erroneous in upholding the deficiencies assessed by the Commissioner.

## II. The Overhead Costs in Rebuilding Freight Cars

■ During the years 1960–1964, L&N rebuilt freight cars on its own assembly line; from 1962–1964, it built new freight cars as well. The taxpayer capitalized most of the costs incurred in its building and rebuilding programs; however, it expensed 1) payroll taxes on labor, 2) certain fringe benefits, including vacation pay and health and welfare benefits, and 3) "deadhaul" costs of transporting building materials on its own line.

In the Service's report covering the taxable year 1964, the Revenue Agent assigned to the L&N audit determined that the overhead costs noted above should have been capitalized. Accordingly, he performed a "year of change" adjustment under § 481 of the Internal Revenue Code. This adjustment involved adding the overhead costs the taxpayer had deducted in previous years and subtracting from the total depreciation L&N could have claimed had it capitalized those costs as they occurred. The net figure was then included in the income for 1964.

L&N challenges each of the actions taken with respect to these changes.

### A. Fringe Benefits and Deadhaul Costs.

In upholding the Commissioner's determinations, the Tax Court found that 26 C.F.R. § 1.263(a)–2(a) and *Woodward v. Commis-*

*sioner*, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), made applicable to this case the general rule that costs incurred in the acquisition of capital assets are to be treated as capital expenditures. It cited *Adolph Coors Co. v. Commissioner*, 519 F.2d 1280 (10th Cir. 1975), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976), which applied the capitalization rule to taxpayer-constructed assets and mandated use of the "full cost absorption" method of accounting.

L&N attempts to distinguish *Coors* from the present controversy by noting that the Coors Brewing Company was a beer manufacturer whose market was expanding so rapidly that 37 percent of its personnel were involved in the construction of assets to increase beer production capacity. By contrast, L&N asks us to dismiss its freight car rebuilding and building program as "incidental" to its transportation operations. *See Fort Howard Paper Co.*, 49 T.C. 275 (1967). We believe, however, that the Tax Court was fully justified in holding *Fort Howard* inapposite to this case. The magnitude and scale of L&N's program, in which over 9,000 freight cars were rebuilt during a 5-year period, the construction of a new facility to house the assembly line, and the full-time employment of 300 workers belie the taxpayer's suggestion that its rebuilding activities were insignificant.

We agree further with the Tax Court that the rationale of *Commissioner v. Idaho Power Co., supra*, must control this issue. In that case the Supreme Court ordered the taxpayer to capitalize depreciation on transportation equipment used in the construction of capital facilities. The Court emphasized 1) the importance of matching income with expense by amortizing costs incurred in the building of capital facilities over those facilities' respective useful lives, and 2) the policy of maintaining parity between the taxpayer who builds his own capital asset and the taxpayer who purchases a similar asset from an independent contractor or dealer. The objective of tax parity is most readily achieved by requiring capitalization of all costs incurred in the construction of a capital asset. *Id.* at 11–14, 94 S.Ct. at 2763–2765.

We believe that these principles apply fully to the "deadhaul" costs and fringe benefits enumerated at the beginning of this discussion; accordingly, we affirm the judgment of the Tax Court as to those items. Payroll taxes, on the other hand, appear to be an exception to the general rule of *Idaho Power* and will therefore be treated separately.

## B. Payroll Taxes.

■ In requiring L&N to capitalize all costs associated with its freight car rebuilding program, the Tax Court failed to distinguish between payroll taxes and the deductions disallowed in the preceding section of this opinion. We are persuaded that taxes paid under the Railroad Retirement Tax Act are currently deductible.

Section 162 of the Internal Revenue Code authorizes the deduction of taxes as an ordinary and necessary business expense; § 263, on the other hand, prohibits deductions for amounts expended "for new buildings or for permanent improvements . . . made to increase the value of any property." It is undisputed that § 263 may operate to remove ordinarily deductible expenses from the ambit of § 162. Labor expense is an obvious example. Wages, normally a deductible item, must be capitalized under § 263 if they are attributable to capital improvement. Payroll taxes on wages of this latter type, however, present a somewhat different problem.

Crucial to this question is Code § 266, claimed by both parties in support of their respective positions. Section 266 provides:

> No deduction shall be allowed for amounts paid or accrued for such taxes and carrying charges as, under regulations prescribed by the Secretary, are chargeable to capital account with respect to property, if the taxpayer elects in accordance with such regulations, to treat such taxes or charges as so chargeable.

Thus, in essence, certain expenses specified by regulation may, at the taxpayer's option,

be *either* deducted *or* capitalized. 26 C.F.R. § 1.266–1(b)(2) stipulates that "[a]n item not otherwise deductible may not be capitalized under § 266." It follows logically that any "tax or carrying charge" which the Secretary makes eligible for elective capitalization under § 266 may, alternatively, be currently expensed if the taxpayer so chooses.

Section 266 itself does not confer deductibility on an expense item; common sense, however, dictates that only normally deductible items ever find their way into the § 266 regulations. It would be anomalous to suppose that the Secretary might include under § 266 a "*tax or carrying charge*" which *must* be capitalized by virtue of § 263.

L&N contends that payroll taxes on wages attributable to the construction of capital assets áre subject to § 266 election. To substantiate this claim, it points to Example 3, Regulation 266–1(b).[1] The Commissioner denies the relevance of Example 3 to this case, advancing the argument that it applies only to payroll taxes incurred in connection with the construction of *real* property. When the question involves *personal* property such as freight cars, the Commissioner insists that only Regulation 266–1(b)(1)(iii)[2] can provide a § 266 election. Inasmuch as Regulation 266–1(b)(1)(iii) makes no mention of payroll taxes, the Commissioner concludes that L&N has no capitalization option under § 266 *for* the taxes in dispute. Absent specific regulatory provision for a § 266 election, we are asked to conclude that the Railroad Retirement Tax Act taxes deducted by L&N must be capitalized under § 263.

We believe that the Commissioner's argument misses the point. The issue is not whether the § 266 regulations distinguish between payroll taxes associated with the construction of real assets and those incurred with reference to personalty; rather, the issue is whether the payroll taxes in question are "otherwise deductible." As we have already noted, the inclusion under § 266 of a specific "tax or carrying charge" creates an inference that the tax is "otherwise deductible." That the § 266 regulations are silent concerning personal property-related payroll taxes does not, however, compel the opposite conclusion. Inclusion under § 266 does not *make* a tax deductible; it merely evidences that the tax *is* "otherwise deductible" despite its relationship to the construction of capital assets. In other words, deductibility of that tax is unaffected by the provisions of § 263. If § 263 does not require capitalization of real property-related payroll taxes, we see nothing in that section which suggests that personalty-related payroll taxes do not similarly enjoy "otherwise deductible" status. Absent any evidence from the Commissioner that such a distinction does in fact exist, we see no reason to impose an arbitrary and confusing reading upon the tax code. We hold, therefore, that payroll taxes incurred in the construction of any capital asset—real or personal—are deductible notwithstanding § 263.

The Supreme Court's opinion in *Idaho Power, supra,* supports our conclusion. Despite its adherence to the general rule of tax parity, the Court noted that the taxpayer had not capitalized Social Security taxes attributable to labor performed on capital projects. Neither the Court nor, apparently, the Commissioner, interpreted § 263 to mandate a different result. *Id.* at 5 and 9, 94 S.Ct. at 2760, 2763.

### C. The Accounting Year of Change Adjustment.

When the Commissioner determined that L&N should have capitalized the over-

---

1. Example 3 reads:

 B's election to capitalize the Social Security taxes paid in erecting the office building started in February, 1957, does not bind him to capitalize the Social Security taxes paid in erecting the hotel; he may deduct the $3,000.00 Social Security taxes paid in erecting the hotel.

2. Under Regulation 266-1(b)(1)(iii) taxpayers have an option to capitalize a) interest on a purchase money loan, b) taxes imposed on the purchase, storage, use, or consumption of the property and c) taxes paid by an employer measured by compensation for services in transporting or installing the property.

head costs discussed above, he implemented a § 446 "change of accounting method"[3] beginning in the year 1964. As a result of this change, certain deductions claimed in that year were disallowed and the depreciation allowance for rebuilt freight cars was increased. The taxpayer, however, had previously deducted a portion of the amount added to the depreciable basis of pre-1964 rebuilt cars; had no further adjustment taken place, the increased depreciation allowance would, in effect, have permitted L&N to deduct the same costs twice.

To prevent such a duplication of deductions, the Commissioner performed a § 481 "year of change" adjustment.[4] This adjustment meant including in L&N's 1964 income the difference between the amount previously deducted and the increased depreciation that would have been allowable had the overheads been properly capitalized.

The taxpayer raises three objections to the Commissioner's actions: a) that a § 481 adjustment is not mandatory whenever the Commissioner requires capitalization of previous deductions; b) that it does not seek to depreciate the overheads and that it is therefore unnecessary to include them in income; and c) that a single § 481 adjustment is not intended to be a substitute for adjustments which should have been made on a year by year basis.

■ First, the taxpayer is correct in pointing out that a § 481 adjustment is not the mandatory remedy whenever capital costs have been improperly deducted. It is, however, a perfectly permissible response and one which has been upheld in a similar case. See *Adolph Coors Co. v. Commissioner, supra* ; 26 C.F.R. 1.481–1(1)(a)(1). The Commissioner was well within his rights

when he chose to rectify the taxpayer's error by means of a "year of change" adjustment. Inasmuch as the Commissioner's action was a proper exercise of his discretion, we may dismiss L&N's initial argument without further analysis.

The taxpayer's second contention is similarly without merit. To say that L&N has not sought to depreciate its overhead costs is merely to restate the argument advanced unsuccessfully on the substantive issue. Obviously, L&N does not wish to depreciate its overheads; it has already expensed them. When, however, the choice is limited to a depreciation deduction or no deduction at all, we are confident that the taxpayer would elect to claim depreciation.

Third, L&N observes that the Commissioner could have challenged the deduction of overhead costs on a year by year basis, since 1960 and subsequent years were "open" under the statute of limitations. Had he done so, the burden of proof would have shifted to the government. Instead, the Commissioner implemented a § 481 adjustment for 1964 alone, thereby leaving the burden of proof upon the taxpayer.

We are unable to find any impropriety in the Commissioner's action. The government singled out the year 1964 for a separate audit because the net operating loss carryback L&N had claimed from 1964 affected taxes in previous years. No § 446 change in accounting method was made until the 1964 audit. Because of this sequence we believe, as did the Tax Court, that the Commissioner was justified in performing the § 481 adjustments in 1964 alone. *See* 66 T.C. at 1017, n.5.

*Fred P. Pursell*, 38 T.C. 263, 276 (1962), cited by L&N, is inapposite. In contrast

---

3. A "change of accounting method" may affect the "overall plan of accounting for gross income or deductions" or merely "the treatment of any material item used in such overall plan." 26 C.F.R. 1.446–1(e)(2)(ii)(a). In this case we are concerned only with the latter, limited form of change.

4. Section 481 provides:
 (a) General Rule—In computing the taxpayer's taxable income for any taxable year . . .

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding year was computed, then
(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted . . . .

with *Pursell,* the items affected by the § 481 adjustment in this case relate solely and obviously to the taxpayer's freight car rebuilding program. Furthermore, L&N makes no claim that the Commissioner's use of § 481 resulted in a prejudicial lack of notice.

Finally, as the Tax Court found, "the monetary limitations set forth in [§ 481] subsection (b) effectively serve to prevent abuses resulting from the failure to raise the issues in prior years." 66 T.C. at 988, n.5. *See also Cameron Iron Works, Inc. v. United States,* 621 F.2d 406, 411 (Ct.Cl. 1980). Under § 481(b), any increase in tax resulting from a "substantial" adjustment must be limited to the amount of additional taxes that would result from spreading the amount of the adjustment over a three-year period ending with the "year of change." We feel, as did the Tax Court, that this statutory safeguard adequately protects L&N against undue hardship.

### D. The Amendment of the Tax Court's Opinion.

■ The initial report of the Tax Court in this case, issued by the assigned special trial judge, was filed February 11, 1976. The report included a finding of fact that L&N had rebuilt 1,966 freight cars in 1964. On March 29, 1976, the Commissioner filed an exception to this finding; he claimed a) that certain evidence contained in the record had been accorded insufficient weight, and b) that this evidence pointed to a total of 3,620 cars rebuilt in 1964. Nonetheless, in his opinion of September 9, 1976 Judge Drennan adopted the special trial judge's figure of 1,966 cars. Once the opinion was issued, the only aspect of the decision left "open" was the actual Rule 155 tax computation. That computation would, of course, be based upon the findings contained in the opinion.

The Rule 155 computation hearing was held October 5, 1977, more than a year after the opinion was filed. At the hearing, the presiding judge stated that he had adopted the 1,966-car figure only to illustrate the magnitude of L&N's rebuilding program.

He subsequently determined that the Commissioner's figure seemed to be correct, and permitted the government to file a Rule 161 motion for revision. That rule provides: "Any motion to vacate or revise a decision, with or without a new or further trial, shall be filed within 30 days after the decision (is) entered, unless the Court shall otherwise permit." A revised finding of fact concerning the number of cars rebuilt in 1964 was entered March 17, 1978.

L&N alleges that the Tax Court was without authority to reconsider the finding of fact. It argues that the court's discretion to entertain a Rule 161 motion out of time is limited to "extraordinary circumstances" or to the reception of newly discovered evidence. Neither alleged prerequisite obtains in the present case. In support of its position, the taxpayer cites *Scott v. Commissioner,* 117 F.2d 36, 40 (8th Cir. 1941): "Applications for rehearing . . . are not favored, and to warrant a reopening of the case it must appear that evidence is in fact newly discovered and not merely that the importance of it is newly discovered."

The Commissioner, on the other hand, emphasizes the language of Rule 161, which gives the Tax Court broad discretion to entertain tardy motions for revision. Nothing in the rule itself suggests that this discretion extends only to cases involving new evidence or other "extraordinary circumstances." Furthermore, the Commissioner argues, the presiding judge noted in a memorandum that the evidence submitted in support of the government's motion satisfied the "clear and convincing" standard of *Rubel v. Commissioner,* 74 F.2d 27 (6th Cir. 1934).

We cannot condone the Commissioner's unexplained failure to observe Rule 161's 30-day limit; neither do we wish to minimize the fundamental importance of finality in litigation. On balance, however, we deem it inadvisable to impose arbitrary restrictions upon the Tax Court's exercise of Rule 161 discretion. As the taxpayer concedes, the language of that rule is unqualified; quite plainly, it contemplates that the court, confronted with an out of time mo-

tion for revision, may either grant or deny leave to file on the basis of its sound discretion.

In this case, the presiding judge determined that the interests of justice in accurate factfinding outweighed any negative impact the government's untimeliness might have upon the taxpayer. We do not believe that the judge's action constituted an abuse of discretion; nor do we find any inherent "unfairness" in the court's decision to correct an error in its original findings of fact. To hold otherwise would amount to an impermissible substitution of our judgment for that of the Tax Court.

### III. The Grading and Ballast Issue.

■ In 1964, L&N installed a "centralized traffic control" system. Centralized traffic control operates on electrical signals; it enables trains to move over a single line instead of requiring two parallel track systems. Upon installation of centralized traffic control, L&N removed portions of the existing parallel track system. Rails, ties, and other track materials were removed from the "abandoned" line; the grading and ballast, however, remained in place. For tax computation purposes, L&N assumed retirement of the outside half of its line. Where the main lines diverged, the taxpayer took retirement deductions for all grading associated with the removed line. No retirement deductions were claimed where bypass tracks remained.

The Commissioner disallowed the entire $539,660.18 deduction claimed for grading retirement, and all but $45,731.56 of the $296,090.93 deduction taken for ballast retirement. The Tax Court upheld the Commissioner's determination on the ground that the assets had continuing utility in the taxpayer's business.

L&N makes two allegations of error: a) that the only government witness on the grading issue admitted ignorance concerning precisely which grading was in dispute, and b) that the more "lenient" standard set out in § 167 of the Internal Revenue Code should control the grading issue in lieu of the more "stringent" standard of § 165.

At the outset, we must decide whether the grading retirement deduction is governed by § 167 or § 165. 26 C.F.R. 1.167(a)–8(a) provides in part:

> For the purposes of this Section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business .... The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition, for example, by being placed in a supplies or scrap account.
>
> (3) Where an asset is permanently retired from use in the trade or business ... but is not disposed of by the taxpayer or physically abandoned (as for example when the asset is transferred to a supplies or scrap account) gain will not be recognized. In such a case, the loss will be recognized and measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement, if greater, ....

The relevant portion of 26 C.F.R. 1.165–2(c) reads:

> A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.

L&N contends that grading is a depreciable asset, and that a § 167 deduction can therefore be taken without a "disposition" or actual physical abandonment. According

to the taxpayer, § 167 is less stringent than § 165, which requires a showing that the asset's usefulness had been completely eliminated. We cannot agree.

We believe, as did the Tax Court, that the depreciability of grading is irrelevant. We find no difference between § 167's standard of "permanent withdrawal from use" and § 165's requirement of "termination of the usefulness . . . where such property is permanently discarded from use . . . ." Furthermore, we agree with the Tax Court that L&N failed to establish error in the Commissioner's determination that the assets have continued usefulness. The taxpayer's own witness testified that both the grading and ballast were still used. In light of that testimony, the government witness' ignorance concerning the precise location of the assets in question is scarcely a basis for determining that the Tax Court's findings of fact were clearly erroneous. The court below properly observed:

> It is possible that petitioner may be entitled to an abandonment loss for grading and ballast under a single line of track that was removed, that is, where the former double tracks diverged and one of them was retired and removed as a result of CTC. However, "the taxpayer must establish that the property actually did lose its useful value, and that he, by reason thereof, actually did write off and abandon the property as an asset in the particular year for which deduction of the loss is claimed." *Stanley Burke*, 32 T.C. 775, 780 (1959), *aff'd*, 283 F.2d 487 (9th Cir. 1960). The evidence offered by petitioner is insufficient to establish the extent of such sections of grading and ballast or that those sections of grading and ballast were no longer used by petitioner for any useful purpose. The fact that petitioner wrote them off on its books alone is not enough. 66 T.C. at 1007, n.30. *See also Western Maryland Ry. Co. v. United States*, 291 F.Supp. 935 (D.Md. 1968).

The judgment of the Tax Court is affirmed, save for the ruling on payroll tax deductions. That portion of the judgment is reversed and remanded to the Tax Court with instructions to enter computations consistent with this opinion.