NATIONAL LIFE INSURANCE COMPANY AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2276–93.          Filed November 14, 1994.

*Arthur L. Bailey* and *James Walker Johnson,* for petitioner.
*Diane D. Helfgott,* for respondent.

COHEN, *Judge:* Respondent determined deficiencies of $83,769, $568, and $1,185 in petitioner's Federal income tax for 1981, 1982, and 1984, respectively. The sole issue raised in the petition and remaining for decision is whether petitioner is required to reduce its 1984 section 808(c)(1) policyholder dividends deduction by $40,762,000.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue.

### FINDINGS OF FACT

Most of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

At the time the petition was filed, petitioner's principal office was located in Montpelier, Vermont. Petitioner is a mutual life insurance corporation organized under Vermont law. During all relevant years, petitioner was a calendar year taxpayer.

*Policyholder Dividends*

Prior to and during the years in issue, petitioner issued participating whole life insurance policies that provided for the possibility of payments of dividends to policyholders. Under participating insurance policies, policyholder dividends are distributed from the surplus that results when an insurer's actual experience with respect to payments under issued policies has been more favorable than the insurance company anticipated when it established the amount of premiums to be charged for those policies. Like other mutual life insurance companies, petitioner assessed its actual experience at each yearend and at that time determined, based on formulas reflecting mortality rates, investment return, and levels of expense, the amount of annual policyholder dividends that it would pay on policy anniversaries (anniversary of policy issue date) in the following year.

Under the practice followed by most insurance companies, the amount of policyholder dividends that the insurer determined would be payable on anniversaries in the following year was not guaranteed (nonguaranteed practice). The

policyholder dividends were contingent on the policy's being in force on its anniversary in the following year. Thus, if a policy lapsed before its anniversary in the following year, the insurer would not pay any policyholder dividends on that policy.

In contrast, from 1969 through 1986, petitioner followed a guaranteed "pro rata" policyholder dividend practice (pro rata practice) for dividends payable in the following year with respect to most of its policies. Under the pro rata practice, if a policy that was covered by that practice failed to remain in force until its anniversary date in the following year, petitioner was obligated to pay a pro rata portion of the annual policyholder dividend that would have been paid on the policy's anniversary date, had that policy remained in effect. In other words, the payment of the pro rata portion was not contingent on the policy's being in force on its anniversary date in the following year. The pro rata amount was based on the number of months that a policy remained in force since its last anniversary. For example, if petitioner determined that it would pay a $100 dividend on a policy with a June 30 anniversary date and that policy terminated on January 1 in the following year, petitioner would pay $50 ($100 × $6/12$). If the policy was in force on June 30 of the following year but then terminated on October 1 of that year, petitioner would pay $100 ($100 × $12/12$) on June 30 and would pay an additional $25 ($100 × $3/12$) at the time of termination.

*Policyholder Dividends Reserve*

As a life insurance company, petitioner reported its assets, liabilities (including a reserve for policyholder dividends), and income for State regulatory purposes on the "annual statement" form prescribed by the National Association of Insurance Commissioners (NAIC). NAIC annual statement accounting rules established a uniform practice that is used by all life insurance companies in computing the amount reported as the reserve for policyholder dividends payable in the following year.

Under NAIC rules, the policyholder dividends reserve is an "estimate" of the insurer's liability for each policyholder dividend payable on that policy's anniversary in the following

year. The calculation of the reserve amount is not based on accrual accounting method principles. Although the "estimated amount" is standard practice under NAIC rules, each insurance company must take its own dividend payment practice into account in determining its estimated dividend liability amount. For example, insurance companies using the nonguaranteed practice generally compute their reserve by reducing the estimated amount of policyholder dividends that would be payable if each policyholder were to receive a dividend by the expected portion of annual dividends that will not be paid because of the anticipated termination of policies prior to their anniversary.

For each year from 1958 through 1985, petitioner set aside a reserve for policyholder dividends in accordance with NAIC rules in order to reflect its estimated liability to pay policyholder dividends in the following year. Petitioner's NAIC annual statement reserve included both its liability to pay dividends covered by the pro rata practice and its liability to pay dividends not covered by the pro rata practice. Petitioner calculated its reserve as the estimated amount of policyholder dividends payable in the following year if each policy were still in force as of its anniversary date in the following year. For example, if petitioner determined that, in the following year, it would pay a policyholder dividend of $100 with respect to each of 1,000 particular policies with a June 30 anniversary date, the amount of the reserve would be $100,000, even though not all 1,000 policies would be in force on June 30 of the following year. With respect to the policies covered under the pro rata practice, the amounts included in petitioner's reserves were determined on the assumption that each policy would be in force on its anniversary in the following year, because petitioner assumed that the amounts associated with pro rata payments for policy terminations prior to and after anniversaries were approximately offsetting.

*Petitioner's Unconditional Liability*

Based on the actuarial assumption that policies are evenly distributed throughout the year, the average issue date for policies issued in any year is June 30. As a result, on average, at December 31 of each year, petitioner has an unconditional liability to pay 6 months', or one-half year's, worth of

dividends on policies covered by the pro rata practice. The parties agree that, at each yearend, the amount of petitioner's unconditional liability to pay policyholder dividends in the following year is reasonably determined to be equal to one-half of the portion of its yearend reserve for policyholder dividends payable in the following year that is set aside for policyholder dividends covered by the pro rata practice:

|  | *1983* | *1984* | *1985* |
|---|---|---|---|
| Annual statement reserve for policyholder dividends | $84,450,000 | $86,050,000 | $90,300,000 |
| Less: Reserve for policyholder dividends not covered by the pro rata practice | (2,926,000) | (3,836,050) | (4,570,000) |
|  | 81,524,000 | 82,213,950 | 85,730,000 |
| × 50 percent | 50% | 50% | 50% |
| Unconditional liability | 40,762,000 | 41,106,975 | 42,865,000 |

These amounts satisfy the requirements for an accrual under the accrual method of accounting.

*Policyholder Dividends Deductions*

Petitioner's policyholder dividends deduction for 1983, computed under former section 811 before limitation by former section 809(f), included the policyholder dividends that were paid during 1983 plus the increase in the yearend 1983 policyholder dividends reserve over the 1982 yearend policyholder dividends reserve, as follows:

| | | |
|---|---|---|
| Policyholder dividends paid in 1983 | - - - | $85,525,564 |
| 12/31/83 policyholder dividends reserve | $84,450,000 | - - - |
| 12/31/82 policyholder dividends reserve | 83,350,000 | 1,100,000 |
| 1983 policyholder dividends deduction | - - - | 86,625,564 |

On its 1984 Federal income tax return, petitioner computed its policyholder dividends deduction under section

808(c)(1) (before reduction as required by sections 808(c)(2) and 809) as policyholder dividends paid during 1984, plus its unconditional liability for policyholder dividends as of December 31, 1984, as follows:

| | |
|---|---|
| Policyholder dividends paid in 1984 | $91,808,304 |
| 12/31/84 unconditional liability for policyholder dividends | 41,106,975 |
| 1984 policyholder dividends deduction | 132,915,279 |

In the statutory notice of deficiency, respondent reduced petitioner's 1984 policyholder dividends deduction under section 808(c)(1) (before reduction as required by sections 808(c)(2) and 809) by $40,762,000, which represented the "reverse" of the 1983 policyholder dividends accrual (1983 unconditional liability).

On its 1985 income tax return, petitioner computed its section 808(c)(1) policyholder dividends deduction (before reduction as required by section 808(c)(2) or section 809) as follows:

| | |
|---|---|
| Policyholder dividends paid | $96,404,179 |
| 12/31/85 unconditional liability for policyholder dividends | 42,865,000 |
| 12/31/84 unconditional liability for policyholder dividends | (41,106,975) |
| 1985 policyholder dividends deduction | 98,162,204 |

## OPINION

Prior to 1984, former section 811(b) allowed life insurance companies policyholder dividends deductions that were computed using the annual statement reserve method of accounting. Under the reserve method, the policyholder dividends deduction, before limitation by former section 809(f), equaled the policyholder dividends paid during the year, plus the reserve for policyholder dividends at the end of the year, less the reserve at the end of the preceding year. The parties agree that petitioner properly computed its 1983 policyholder dividends deduction under section 811(b) (before reduction by former section 809(f)) as follows:

| | |
|---|---|
| Policyholder dividends paid in 1983 | $85,525,564 |
| 12/31/83 policyholder dividends reserve | 84,450,000 |

12/31/82 policyholder dividends reserve ........................ (83,350,000)

86,625,564

To the extent that a company's yearend annual statement reserve increased over its prior yearend reserve, former section 811(b) provided life insurance companies with a timing benefit, in that the policyholder dividends deduction would exceed the dividends paid in that year. Moreover, because the amounts that were included in the annual statement reserve were not required to meet accrual standards, former section 811(b) provided an additional timing benefit with respect to nonguaranteed dividends that were included in the annual statement reserve; life insurance companies received the benefit of including the full amount of policyholder dividends reserves in the deduction calculation, regardless of whether any portion of their reserves satisfied the criteria for accrual under the accrual method of accounting.

In 1984, Congress amended section 811, now found at section 808(c)(1), to provide that the policyholder dividends deduction (before reduction as required by sections 808(c)(2) and 809) shall be "the policyholder dividends paid or accrued during the taxable year." Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98–369, sec. 211(a), 98 Stat. 720. The parties agree that petitioner's 1985 deduction under section 808(c)(1) is computed as follows:

Policyholder dividends paid in 1985 ............................... $96,404,179

12/31/85 unconditional liability for policyholder dividends ........................................................................ 42,865,000

12/31/84 unconditional liability for policyholder dividends ........................................................................ (41,106,975)

98,162,204

The parties disagree, however, on the computation under section 808(c)(1) of the policyholder dividends deduction for 1984, the year of the change from the reserve method to the paid or accrued method. As a result of the change in 1984 to the paid or accrued method, amounts that were included in the 1983 yearend reserve, and thus deductible in 1983 under the old reserve method, became deductible again when actually paid in 1984 under the new paid or accrued method. Normally, double deductions, such as these, that are attributable to a change in accounting method would be subject to adjustment under section 481.

Section 481 provides for an adjustment to prevent the duplication or omission of income or expense that may otherwise occur solely as a result of a change in the method of accounting. *Pursell v. Commissioner,* 38 T.C. 263, 271 (1962), affd. 315 F.2d 629 (3d Cir. 1963). The section 481 adjustment consists of the amount deducted under the old method that is deductible under the new method in the year of change or later years. *Western Casualty & Sur. Co. v. Commissioner,* 571 F.2d 514, 520 (10th Cir. 1977), affg. 65 T.C. 897 (1976). The parties agree that, if section 481 applied or if section 807(f) applied, the amount of policyholder dividends that "accrued" in 1983 would not be deductible in 1984 under the paid or accrued method and, thus, that the section 481 adjustment that would have been applicable would equal the balance of petitioner's 1983 reserves for policyholder dividends, reduced by the amount of such reserves that accrued prior to 1984:

| | |
|---|---:|
| 12/31/83 policyholder dividends reserve (deductible under reserve method) | $84,450,000 |
| Deemed 12/31/83 accrued policyholder dividends liability (unconditional liability—not deductible for 1984 under paid or accrued method) | (40,762,000) |
| | 43,688,000 |

Congress, however, provided a transitional rule for insurance companies that, inter alia, changed their method of accounting for policyholder dividends as a result of the enactment of the paid or accrued requirement. DEFRA section 216(b), 98 Stat. 758, provides:

(b) Fresh Start.—
(1) In general.—Except as provided in paragraph (2), in the case of any insurance company, *any change in the method of accounting* (and any change in the method of computing reserves) between such company's first taxable year beginning after December 31, 1983, and the preceding taxable year which is *required solely by the amendments* made by this subtitle *shall be treated as not being a change in the method of accounting* (or change in the method of computing reserves) for purposes of the Internal Revenue Code of 1954. [Emphasis added.]

The dispute here centers on the parties' different interpretations of the fresh-start provision; specifically, the dispute focuses on whether petitioner's 1984 deduction under the section 808(c)(1) paid or accrued method must be adjusted to account for the portion of petitioner's 1983 year-

end policyholder dividends reserve that satisfied accrual standards in 1983. Petitioner contends that, under the fresh-start provision, its 1984 policyholder dividends deduction (before reduction by section 809) is computed without taking into account any portion of its 1983 yearend policyholder dividends reserve, as follows:

| | |
|---|---|
| Policyholder dividends paid in 1984 .............................. | $91,808,304 |
| 12/31/84 unconditional liability for policyholder dividends (1984 accrual) ................................................. | 41,106,975 |
| | 132,915,279 |

Petitioner does not dispute that, as a result of its pro rata guarantee practice, $40,762,000 of its 1983 policyholder dividends reserve represents an amount for which petitioner had a fixed liability to pay policyholder dividends in 1984 and, thus, that this amount met the standards of accrual under section 461 in 1983. However, petitioner contends that, because it was on the reserve method in 1983, it did not "hold" this amount as an accrual in 1983 and, thus, that there is no "prior year accrual" to take into account in computing its 1984 deduction under section 808(c).

Respondent, on the other hand, contends that the amount of petitioner's 1983 yearend unconditional liability, $40,762,000, represents an amount paid in 1984, but accrued in 1983, and thus may not be deducted in 1984 under section 808(c)(1). Respondent contends that petitioner's 1984 policyholder dividends deduction (before reduction by section 809) is as follows:

| | |
|---|---|
| Policyholder dividends paid in 1984 .............................. | $91,808,304 |
| 12/31/84 unconditional liability for policyholder dividends ....................................................................... | 41,106,975 |
| 12/31/83 unconditional liability for policyholder dividends (guaranteed portion of 12/31/83 annual statement reserve) .............................................................. | (40,762,000) |
| | 92,153,279 |

Respondent argues that the "plain meaning" of the fresh-start provision is that the new method is to be implemented as if the paid or accrued method had always been the method of calculating the policyholder dividends deduction. Respondent contends that, if the paid or accrued method had always been petitioner's method of calculating the policyholder dividends deduction, petitioner would not be entitled to deduct,

in 1984, amounts that accrued and became deductible in 1983.

Respondent also contends that, irrespective of petitioner's method of computing dividends in 1983, section 808(c)(1) must be applied consistently throughout 1984 in order clearly to reflect income in 1984 under the accrual method. Thus, amounts that satisfied accrual standards prior to 1984 are not deductible under the accrual method in 1984. Under respondent's interpretation, the only effect of the fresh-start provision is to eliminate any adjustments that would normally result under section 481 because of the change from the reserve method of accounting to the paid or accrued method. Thus, respondent contends that petitioner's "fresh-start benefit" is limited to the $43,688,000 section 481 adjustment that would have been included in income in the absence of the fresh-start provision.

Although petitioner did not use the accrual method in 1983 and thus did not "hold" any yearend "accrual" balances as of December 31, 1983, nothing in the fresh-start provision indicates that petitioner is relieved from using the accrual method consistently throughout 1984. Section 1.461–1(a)(2), Income Tax Regs., provides that expenses are deductible under an accrual method of accounting in the taxable year in which all of the events have occurred that determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. If petitioner is not required to adjust its 1984 deduction for amounts that met the standards for accrual in 1983, it would be deducting expenses in 1984 that satisfied the "all events test" in 1983; accordingly, its 1984 deduction would be improper under section 808(c)(1).

Petitioner, however, contends that change in method of accounting treatment consists of two steps: (1) Consistent use of the new method in the year of change and (2) a "net" section 481 adjustment to correct the distortions caused by the use of the new method. To comply with the fresh-start prohibition against change in method of accounting treatment, petitioner contends that both consistent use of the new method and the "net" section 481 adjustment are prohibited. Because consistent use of the accrual method is prohibited, petitioner argues that computation of a January 1, 1984, accrual balance is prohibited.

Petitioner cites several cases involving changes in methods of accounting for inventory, in which we held that the new method must be applied in computing both opening and closing inventory for the year in which the change occurred. *Wayne Bolt & Nut Co. v. Commissioner,* 93 T.C. 500 (1989); *Superior Coach of Florida, Inc. v. Commissioner,* 80 T.C. 895 (1983); *Primo Pants Co. v. Commissioner,* 78 T.C. 705 (1982); *Dearborn Gage Co. v. Commissioner,* 48 T.C. 190 (1967). Petitioner also cites cases involving the creation of an opening depreciable balance when taxpayers were required to capitalize expenditures that were previously deductible. *Louisville & N. R.R. v. Commissioner,* 66 T.C. 962 (1976), affd. in part, revd. and remanded in part 641 F.2d 435 (6th Cir. 1981); *Electric & Neon, Inc. v. Commissioner,* 56 T.C. 1324 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).

Petitioner, however, misapplies this authority. The cases cited by petitioner recognize that the amount of income or deductions computed consistently under the new method in the year of change is *related* to the computation of the section 481 adjustment, as that adjustment will account for any omission or duplication resulting from consistent application of the new method. See, e.g., *Louisville & N. R.R. v. Commissioner, supra.* They do not say that consistent application of the new method is required *solely* because "change in method of accounting treatment" applies. The inventory cases cited by petitioner refer to a recomputation of an opening balance of inventory in the year of change in order clearly to reflect income under the new method of accounting for that year. For example, in *Primo Pants Co. v. Commissioner, supra,* we stated:

even before the enactment of section 481 under a long line of cases * * *, it has been held that where the Commissioner changes a method of accounting by using a different method of valuing inventories at the end of the year he is required, *in order clearly to reflect income for that year,* to value the opening inventory according to the same method as the closing inventory. [*Primo Pants Co. v. Commissioner, supra* at 725 (quoting *Fruehauf Trailer Co. v. Commissioner,* 42 T.C. 83, 106–107 (1964), affd. 356 F.2d 975 (6th Cir. 1966)); emphasis added.]

In *Primo Pants Co.,* the Commissioner sought to revalue the taxpayer's closing inventory by disallowing percentage writedowns and adding a factor for direct labor and overhead. The Commissioner contended that the revaluation was

a change in method of accounting that required (1) the revaluation of the taxpayer's opening inventory in a manner consistent with the revaluation of closing inventory and (2) an adjustment pursuant to section 481 to prevent the omission of amounts from taxable income. The taxpayer did not dispute that opening inventory had to be revalued in a manner consistent with the method used to value ending inventory but argued that the revaluation was not a change in method of accounting and, thus, that a section 481 adjustment was not required. We held that the revaluation of the taxpayer's inventory was a change in method of accounting and therefore that a section 481 adjustment was required. However, nothing in *Primo Pants Co.* indicated, and the parties in that case did not argue, that, had we concluded that the inventory revaluation was not a "change in method of accounting", the taxpayer would not have had to compute its opening inventory on the same basis as its revalued ending inventory in order clearly to state its income under the new method.

In any event, if we accept petitioner's interpretation of these inventory cases and hold that petitioner was not required to use the new method as of January 1, 1984, to compute an accrual balance, petitioner would remain on its old method, the reserve method. Had petitioner been using its old method as of January 1, 1984, but started using the new method as of the end of the year, seemingly, petitioner's 1984 deduction would be as follows:

| | |
|---|---:|
| Amount paid in 1984 | $91,808,304 |
| 12/31/84 unconditional liability for policyholder dividends (accrual) | 41,106,975 |
| 12/31/83 annual statement reserve | (84,450,000) |
| | 48,465,279 |

This is a result not advocated by either party, and it would not meet the requirements of section 808(c)(1).

Here, petitioner seeks a deduction for amounts that were paid in 1984 as well as for the amount of the accrual balance as of the end of 1984. Thus, petitioner concedes that it was required, at some point during 1984, to change to the accrual method as required by section 808(c)(1), but petitioner does not concede that it was required to consider accrual principles in computing its accrual balance as of January 1, 1984.

Petitioner contends that, if Congress had intended that insurance companies compute an opening accrual balance, Congress would have specified a requirement for that opening computation. Petitioner notes that the fresh-start provision provided relief rules relating to changes in the computation of both policyholder dividends and section 807 reserves. Section 807, formerly section 810, provides for an adjustment to income when the yearend balance of certain reserves, including reserves for life insurance, unearned premiums, annuity contracts, dividend accumulations, advance premiums, and special contingency reserves, differs from the opening balance of such reserves. Petitioner notes that DEFRA section 216(a)(1) specifically provided for the "recomputation" of life insurance reserves as of the beginning of 1984 but made no reference to a "recomputed" opening policyholder dividends accrual. Petitioner argues that Congress' failure to provide a specific reference to a recomputed opening policyholder dividends accrual balance indicates that Congress intended a different result with respect to the changes required by section 808(c)(1).

We disagree. Congress was required to refer to a "recomputed" reserve balance because section 807, the section to which the "recomputed" reserve relates, specifically requires an adjustment to income that is based on the difference between the opening and closing reserves. Section 808(c)(1), in contrast, does not refer to the computation of the dividend deduction by reference to opening or closing balances.

Further, Congress' failure to refer to a recomputed opening policyholder dividends accrual balance does not mean that Congress intended that insurance companies would not be subject to accrual method principles at the beginning of 1984. Under petitioner's "initial" year theory, petitioner would have a zero accrual balance at the beginning of 1984 because it was not on the accrual method in 1983. However, the method that petitioner used in 1983 has no relevance in the determination of the amounts that satisfied the accrual standards in 1983, and, thus, those amounts were not eligible to be deducted under the accrual method in 1984. Moreover, because a portion of the 1983 reserves satisfied the standards for accrual in 1983, a zero accrual balance at the beginning of 1984 would only result under cash method principles. Thus, under petitioner's "initial use" theory, in the year of

the implementation of section 808(c)(1), petitioner would be treated as being on a cash/accrual hybrid method.

Such a result is not supported by the plain language of the fresh-start provision. Congress dictated that the new method should not be treated as a change in method of accounting, but it did not say that insurance companies could avoid applying section 808(c)(1) at the beginning of 1984 or that they could defer the implementation of such changes. Yet, if petitioner is not required to adjust its 1984 deduction for amounts that met the standards for accrual in 1983, petitioner would not be using the accrual method consistently throughout 1984, and its deduction would not satisfy the requirements of section 808(c)(1).

When Congress has desired to limit the applicability of a new method of accounting in the year of a change, it has expressly stated its intention for that result. For example, in the Installment Sales Revision Act of 1980, Pub. L. 96–471, 94 Stat. 2247, Congress provided special treatment for accrual method dealers who elected to change to the installment method of reporting. Congress specifically stated that "Under the bill, an accrual method dealer who elects the installment method of reporting will report gain as payments are received only for sales made on or after the effective date of the installment method election." S. Rept. 96–1000 (1980), 1980–2 C.B. 494, 507. In other words, Congress specified that these dealers would be treated as being on a mixed installment/accrual method.

Petitioner also contends that, if Congress had intended that the fresh-start provision would only preclude a section 481 adjustment, it would have simply stated that result. Petitioner cites other transitional rules where Congress specified the impact of the section 481 adjustment arising from accounting method changes imposed by statute. However, we are not satisfied that Congress' failure to address the applicability of the section 481 adjustment in the fresh-start provision demonstrates that Congress intended that petitioner would not be required to apply accrual principles as of January 1, 1984. Accordingly, we hold that the fresh-start provision does not relieve petitioner from applying accrual principles as of January 1, 1984, and, thus, we conclude that its 1984 policyholder dividends deduction must be reduced by the portion of the 1983 yearend policyholder divi-

dends reserve that satisfied accrual standards in 1983. As a result, the amount of petitioner's "fresh-start benefit" is limited to the amount of the section 481 adjustment that would have resulted under normal change of accounting method rules.

The result of our holding that the fresh-start provision prohibits only the section 481 adjustment is that petitioner, who happened to follow the guaranteed pro rata practice prior to 1984, is entitled to less fresh-start relief than other insurance companies that did not guarantee any portion of their dividends and, thus, did not accrue any portion of their dividends prior to 1984. Petitioner contends that this disparity is harsh and inequitable and results in an incorrect application of the accrual method. Petitioner argues that, under the accrual method, the amount of deductions over time should equal the amount paid and that, if it is required to reduce its 1984 policyholder dividends deduction by the amount that satisfied accrual standards in 1983, it will face a permanent loss of deductions for certain amounts paid after 1983. Petitioner relies on a hypothetical example in the report of its expert, Richard S. Antes (Antes), and on an example based on three pre-1984 policies issued by petitioner to demonstrate its contention that the amount of deductions allowed in post-1983 years with respect to those policies is less than the amount of total dividends paid during those years with respect to those policies.

Petitioner's argument is misplaced. At trial, Antes admitted that, under the facts here, an accrual basis taxpayer would have received accelerated deductions on pre-1983 policies in the early years of such policies, which would have been offset by lower deductions in later years when the accruals decreased because the policies began to lapse. Antes' and petitioner's examples only relate to later years of the pre-1983 policies, when the accruals would be less and when the deductions could be less than the amounts paid on such policies. Thus, these examples are misleading because they do not consider the amounts by which the deductions that are allowed, before consideration of limitations imposed by other Code sections, in pre-1984 years exceeded the amounts actually paid. Moreover, as admitted by Antes at trial, petitioner, under the reserve method, actually received a greater acceleration of deductions in the pre-1984 years because the

reserves that were deducted did not have to satisfy accrual standards.

Under our interpretation of the fresh-start provision, petitioner receives a double deduction for the amount included in the 1983 yearend reserve that did not satisfy accrual standards as of December 31, 1983 (the amount of the section 481 adjustment). The "permanent loss of deductions", of which petitioner complains, actually amounts to a reduced double deduction, which is the portion of the 1983 yearend reserve deducted in 1983 but not deductible again in 1984 because such portion "accrued" in 1983. Other insurance companies that followed the nonguaranteed practice and thus "accrued" no dividends in 1983 and received a double deduction for the entire amount of their 1983 yearend reserve, however, lost the ability to accelerate policyholder dividends deductions in years after 1983 because no amount of their reserves satisfied accrual standards.

Irrespective of whether this result places petitioner at a disadvantage in comparison to most other insurance companies that followed the nonguaranteed practice, respondent contends that its interpretation is in line with the legislative policy underlying the fresh-start provision. Respondent argues that evidence of the legislative purpose of the fresh-start provision is provided in section 808(f).

Section 808(f) provides for a limit of the "1984 fresh-start benefit" when an insurance company changes its business practices so as to accelerate its policyholder dividends deduction under section 808(c)(1). Section 808(f) was added to the Code as part of the 1986 technical corrections legislation, Tax Reform Act of 1986, Pub. L. 99–514, sec. 1821(c), 100 Stat. 2838, and provides:

SEC. 808(f). COORDINATION OF 1984 FRESH-START ADJUSTMENT WITH ACCELERATION OF POLICYHOLDER DIVIDENDS DEDUCTION THROUGH CHANGE IN BUSINESS PRACTICE.—

(1) IN GENERAL.—The amount determined under paragraph (1) of subsection (c) for the year of change shall (before any reduction under paragraph (2) of subsection (c)) be reduced by so much of the accelerated policyholder dividends deduction for such year as does not exceed the 1984 fresh-start adjustment for policyholder dividends (to the extent such adjustment was not previously taken into account under this subsection).

\* \* \* \* \* \* \*

(3) ACCELERATED POLICYHOLDER DIVIDENDS DEDUCTION DEFINED.—For purposes of this subsection, the term "accelerated policyholder dividends deduction" means the amount which (but for this subsection) would be determined for the taxable year under paragraph (1) of subsection (c) but which would have been determined (under such paragraph) for a later taxable year under the business practices of the taxpayer as in effect at the close of the preceding taxable year.

(4) 1984 FRESH-START ADJUSTMENT FOR POLICYHOLDER DIVIDENDS.— For purposes of this subsection, the term *"1984 fresh-start adjustment for policyholder dividends" means the amounts held as of December 31, 1983, by the taxpayer as reserves for dividends* to policyholders under section 811(b) (as in effect on the day before the date of the enactment of the Tax Reform Act of 1984) *other than for dividends which accrued before January 1, 1984.* Such amounts shall be properly reduced to reflect the amount of previously nondeductible policyholder dividends (as determined under section 809(f) as in effect on the day before the date of the enactment of the Tax Reform Act of 1984). [Emphasis added.]

The legislative history of section 808(f) states:

The "fresh start" was granted with respect to the accounting change for policyholder dividends on the assumption that insurance companies would continue to follow their general business practice in declaring policy dividends at the end of the calendar year to be payable on policy anniversaries during the following calendar year only in the event the policy remained outstanding on such anniversary. *It was understood that, given the general business practices, the present-law change in policyholder dividends accounting had the effect of delaying the deduction for policyholder dividends to the taxable year in which they are paid.*

It appears that by guaranteeing policy dividends on termination (which may not change necessarily the payment date of policy dividends) or by changing the payment date by making policy dividends available upon declaration, a company can accelerate the deduction for approximately one half the policyholder dividends that would have been deducted in the following taxable year if there had been no change in the company's business practices in declaring policy dividends. As a practical matter, the *amount of the acceleration of the policyholder dividend deduction could be viewed as restoring a company, in part, to the position it enjoyed under prior law with respect to the timing* of the policyholder dividends deduction. *The "fresh start" for the change in policyholder dividends accounting was intended to mitigate the detriment caused taxpayers by a statutory change in such accounting;* to the extent the detriment caused by the statutory change is mitigated in fact by a company's own changed business practices, the "fresh start" was not intended to give a company additional tax benefits.

[S. Rept. 99–313 (1986), 1986–3 C.B. (Vol. 3) 1, 965–966; emphasis added.]

Section 808(f) does not apply to petitioner, as petitioner did not change its business practice with respect to its policy-

holder dividends. Nevertheless, section 808(f) and its legislative history are relevant to the extent that they express the policy underlying the fresh-start provision. See *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 380–381 (1969); *Heublein, Inc. v. United States,* 996 F.2d 1455, 1465 (2d Cir. 1993).

Respondent contends that section 808(f), read in conjunction with its legislative history, indicates that Congress intended that taxpayers who experienced a greater deferral in the timing of their deductions for policyholder dividends were entitled to a fresh-start benefit greater than that for taxpayers who avoided this deferral. Specifically, respondent argues that section 808(f)(4) indicates that Congress intended fresh-start relief to be applicable only with respect to 1983 reserves for policyholder dividends that did not accrue prior to 1984, which is the amount that would have been subject to adjustment under section 481 in the absence of the fresh-start provision.

Petitioner contends that respondent misconstrues the policy behind section 808(f), which, according to petitioner, was intended only to be a "penalty-like" provision for companies that *changed* their practices in order to accelerate deductions under section 808(c). Petitioner contends that, if, as respondent argues, Congress intended that the fresh-start benefit would not be available for the portions of dividends reserves that accrued prior to 1984, Congress would have explained in section 808(f) that it was merely extending the original fresh-start rules to post-1984 changes in dividend practices. Furthermore, petitioner contends that section 808(f) does not support respondent's argument that the fresh-start provision only provides a "fresh start" to the extent of the 1983 year-end policyholder dividend reserve less the dividends accrued before 1984, because the section 808(f)(4) definition of the "1984 policyholder dividend fresh-start adjustment" provides for an additional adjustment that reduces the section 808(f)(4) amount by nondeductible policyholder dividends under prior law. Because respondent made no adjustment for nondeductible dividends under prior law, petitioner contends that the section 808(f)(4) definition of the "1984 policyholder fresh-start adjustment" does not "parallel" respondent's interpretation of the fresh-start provision and, thus, does not support respondent's position.

Petitioner's arguments overlook the clearly stated legislative policy behind the fresh-start provision, which was to mitigate the lost timing benefit caused by the enactment of section 808(c)(1). See *Estate of Sachs v. Commissioner,* 88 T.C. 769, 773 (1987), affd. in part and revd. in part 856 F.2d 1158 (8th Cir. 1988). Although it does not constitute legislative history, this policy was also expressed by the staff of the Joint Committee on Taxation before the enactment of section 808(f). See Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 610–611 (J. Comm. Print 1984).

The enactment of section 808(c)(1) did not eliminate all of the timing benefit for petitioner. Under section 808(c)(1), petitioner still received an accelerated rate of policyholder dividends deductions to the extent of its guaranteed (accrued) dividends. Thus, petitioner was less disadvantaged by the enactment of section 808(c) than most insurance companies; the only detriment to petitioner as a result of the statutory change was the deferral of its policyholder dividends deduction for the portion of its annual statement reserve that is not guaranteed. When Congress enacted section 808(c)(1), it apparently assumed that most, if not all, insurance companies followed the nonguaranteed practice and that insurance companies would suffer a complete loss of the timing benefit under former section 811. The legislative history of section 808(f) indicates that Congress intended to provide fresh-start relief only to the extent that an insurance company could no longer accelerate the deduction of policyholder dividends. Congress would have had no reason to enact the "penalty-like" provision of section 808(f) if it intended to provide a full fresh-start benefit for insurance companies that retained timing benefits under section 808(c)(1). To the extent that petitioner guaranteed, and thus accrued, policyholder dividends, petitioner retained a timing benefit and is not entitled to a fresh-start benefit.

Petitioner argues that this interpretation is contrary to other portions of the legislative history of the fresh-start provision, to wit:

Under the fresh start transitional rule, this change from a reserve to an accrual method is not to be treated as a change in a method of accounting. Thus, no income or loss is to be recognized with respect to amounts in

existing policyholder dividends reserves. [H. Rept. 98–432 (Pt. 2), at 1421 (1984); S. Rept. 98–169 (Vol. 1), at 547 (1984).]

Petitioner contends that respondent's adjustment of the 1984 deduction requires petitioner to include in income the portion of its 1983 reserve that satisfies accrual standards in violation of the prohibition against recognizing income with respect to amounts in existing policyholder reserves. We disagree. Although the parties agree that a reasonable computation of the accrued dividends amounts is calculated as 50 percent of the reserve, the adjustment at issue is not an adjustment recognizing income with respect to an amount in existing policyholder dividends reserves; rather, it is an adjustment to eliminate amounts that did not accrue during 1984.

Moreover, under petitioner's interpretation of this legislative history, any adjustment that limits the amount of the 1984 deduction is an adjustment that requires the recognition of income with respect to the 1983 reserve balance, regardless of the basis for the limitation. Following petitioner's interpretation to its logical extreme, any deduction claimed in 1984 for amounts included in the 1983 reserve balance, but paid in 1984, would similarly be considered as a "loss with respect to an amount in existing policyholder dividends reserves." Thus, in 1984, petitioner would not be entitled to deduct any portion of the 1983 reserve, even though paid in 1984. Such a result would be contrary to section 808(c)(1) as well as to the fresh-start provision and, thus, was not intended by Congress.

To reflect the foregoing,

*Decision will be entered for respondent.*