# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-3027

_____

| | | |
|---|---|---|
| Dayton Hudson Corporation and Subsidiaries, | * | |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | Appeal from the United States |
| v. | * | Tax Court. |
| | * | |
| Commissioner of Internal Revenue, | * | |
| | * | |
| Respondent. | * | |

_____

Submitted: March 10, 1998
Filed: August 14, 1998

_____

Before BEAM and HEANEY, Circuit Judges, and WATERS,[1] District Judge.

_____

BEAM, Circuit Judge.

This case presents the question whether the method of accounting for inventory shrinkage used by a retailer, Dayton Hudson Corporation and Subsidiaries (Dayton Hudson), is permissible. Dayton Hudson appeals from the tax court's decision upholding the Commissioner of Internal Revenue's (Commissioner's) determination of tax deficiencies. We reverse.

_____

[1]The Honorable Franklin H. Waters, United States District Judge for the Western District of Arkansas, sitting by designation.

## I.    BACKGROUND

The parties have largely stipulated the facts.  Dayton Hudson is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.  This case involves the accounting methods used by two of Dayton Hudson's divisions, Target and Dayton's, for the fiscal year ending on January, 28, 1984 (herein referred to as the 1983 taxable year).  Together with its subsidiaries, Dayton Hudson filed a corporate federal income tax return for the 1983 taxable year.

By the end of the 1983 taxable year, Target operated a chain of 205 low-margin retail stores in 22 states, generating revenues of more than $3 billion.  Dayton's operated 16 traditional department stores, located in Minnesota, North Dakota, South Dakota, and Wisconsin.  These stores generated revenues of approximately $488 million.

Dayton Hudson used the accrual method of accounting and maintained a perpetual inventory system for both financial reporting and tax purposes.  Under the perpetual inventory system, the cost or quantity of goods sold or purchased is contemporaneously recorded at the time of sale or purchase.  Thus, the system continuously shows the cost or quantity of goods that should be on hand at any given time.  Dayton Hudson performed physical inventories to confirm the accuracy of the inventory as stated in the books, and made adjustments to the books to reconcile the book inventory with the physical inventory.[2]

Dayton Hudson took physical inventories at its Target and Dayton's stores in rotation throughout the year.   The parties refer to this technique, which is prevalent in

---

[2]Dayton Hudson used the Last-In, First-Out (LIFO) method of identifying items in ending inventory, and the retail method of pricing inventories.  See Treas. Regs. §§ 1.472-1 and 1.471-8.

the retail industry, as cycle counting. This technique provides management with feedback on the effectiveness of its inventory management.

Target attempted to conduct physical inventories at its individual stores every 8 to 16 months. At times, however, as many as 18 months elapsed between physical inventories. Physical inventories were not taken during the holiday season (November, December, and most of January).[3] At new stores, Target did not perform physical inventories until their second year of operation because it believed that opening-year inventories produced meaningless results. Target generally employed an independent inventory service to perform the actual physical counts.

Dayton's conducted its physical inventories on a departmental basis, counting inventory items on the same day at every store that maintained a particular department. Dayton's performed these counts at various times throughout the entire year. Generally, Dayton's regular employees conducted these physical inventories.

These physical inventories usually revealed shrinkage. Shrinkage (or overage) is the difference between the inventory determined from the perpetual inventory records and the amount of inventory actually on hand. There are many causes of shrinkage, including theft, damage, and accounting and recording errors.

Because the physical inventories were not taken at year-end, Dayton Hudson's perpetual inventory records did not account for any shrinkage that had occurred during the period between the date of the last physical inventory and the taxable year-end. We refer to this period as the stub period. Left unadjusted, Dayton Hudson's book records

---

[3]During the months of December and January, Target also conducted physical inventories at each of its distribution centers and metro warehouses. The results of these inventories were taken into account in April of the following taxable year on a departmental basis by the Target stores serviced by each particular warehouse.

would overstate income because the stub period shrinkage results in a decrease to ending inventory, thus increasing the cost of goods sold and reducing gross income.[4] Accordingly, Dayton Hudson adjusted its book inventories to account for shrinkage.

Dayton Hudson adjusted its book inventories in accordance with a corporate policy, which was contained in the "Controller's Manual."  The policy provided that all companies must take at least one complete physical inventory every taxable year at each store, that book inventories should be reduced according to the "inventory shrinkage accrual rate," which is stated as a percentage of net sales, and that "[e]ach Operating Company Controller is responsible for accounting for inventory shrinkage in accordance with the accrual basis of accounting."  Target and Dayton's each had different methods of setting the "inventory shrinkage accrual rate."

Target set "inventory shrinkage accrual rates" for every department in each store through a series of computations.  It first developed an overall company rate by reviewing the inventory results for the most recent three to five physical inventory periods.  It also considered a variety of other factors known to affect the rate of shrinkage, including demographics, crime levels, management and paperwork problems, shrinkage reduction measures, industry trends, warehouse performance, and store acquisitions.  Next, after considering store-specific factors known to affect shrinkage rates, Target determined preliminary shrinkage rates for each store.  Target then adjusted the preliminary rates so that, in the aggregate, they equaled the company shrinkage as determined by the overall company rate.  Last, Target determined shrinkage rates at the departmental level, based on a three-year average shrinkage rate

---

[4]Slightly simplified, gross income for most retailers means revenues less cost of goods sold.  The cost of goods sold is determined by subtracting ending inventory from the goods available for sale during the year (opening inventory plus inventory purchases during the period).  See Rockwell Int'l Corp. v. Commissioner, 77 T.C. 780, 805 n.13 (1981), aff'd, 694 F.2d 60 (3d Cir. 1982).

for the department at each store.  Those rates were further adjusted to accord with the shrinkage rate for each store in proportion to each department's sales relative to the store's total sales during the most recent twelve-month period.  For new stores, Target generally set shrinkage accrual rates by reference to the average shrinkage rate for the locality, the demographics, and the plans of stores that are located in areas with similar demographics and marketing plans (sister stores).  Using these shrinkage rates, Target would calculate and then record the estimated shrinkage in its perpetual inventory records on a monthly basis.

Unlike Target, Dayton's directly determined shrinkage rates for each department.  In setting a departmental rate, Dayton's considered numerous factors, including the most recent shrinkage history and shrinkage trends of that particular department, the employment of new marketing strategies, changes in demographics, trends that were developing in related departments, changes in security procedures, and particular theft problems.  Dayton's did not set an overall company shrinkage rate.  The estimated shrinkage was calculated and recorded in the perpetual inventory records on a monthly basis.

Each physical inventory would reveal a difference between the estimated shrinkage as reflected in the perpetual inventory records and the shrinkage verified by the physical inventories (estimation error).  Upon completion of a physical inventory, Dayton Hudson would adjust its inventory records to reflect any estimation error.  Consequently, for each taxable year, Dayton Hudson's total adjustments to its inventory records for shrinkage would include (1) any shrinkage estimates for the period from the start of the taxable year until the physical inventory date, (2) any estimation error adjustment, and (3) any stub period shrinkage estimates. Dayton Hudson used the same shrinkage estimates for tax purposes as it used for financial reporting, determining budgets, evaluating employees, and determining the sources of shrinkage.

The Commissioner issued Dayton Hudson a notice of deficiency in the amount of $17,384,314 for the 1983 taxable year. The notice of deficiency made cost adjustments to the LIFO inventories of Target and Dayton's in the respective amounts of $36,339,217 and $2,440,127, reflecting a disallowance of the estimated shrinkage for the stub period. Dayton Hudson filed a timely petition in the tax court seeking redetermination of the resulting deficiencies.

Prior to trial, the Commissioner moved for summary judgment, asserting that Treasury Regulation section 1.471-2(d) prohibits the use of estimated shrinkage as a matter of law. In a reviewed decision, the tax court held that a method of computing shrinkage, including estimated shrinkage, is permissible if it is "sound." Dayton Hudson Corp. and Subsidiaries v. Commissioner, 101 T.C. 462, 465 (1993) (Dayton Hudson I) (12-5 decision). At trial, however, the tax court determined that Dayton Hudson's method of computing shrinkage was not sound. The tax court defined a sound inventory method as one that (1) conforms to the best accounting practice in the trade or business and that (2) clearly reflects income. The tax court found that, although Dayton Hudson's method conformed to the best accounting practice, the Commissioner acted within her discretion in determining that the method did not result in a clear reflection of income.

Dayton Hudson appeals, asserting that its method of estimating shrinkage resulted in a clear reflection of income. Dayton Hudson also contends that the Commissioner's method does not reflect income clearly, and therefore, that the Commissioner abused her discretion in changing Dayton Hudson's method. Additionally, the Commissioner continues to dispute the tax court's holding in Dayton Hudson I that the use of shrinkage estimates is permissible. The Commissioner concedes, however, that Dayton Hudson's inventory method conformed to the best accounting practice within the meaning of I.R.C. § 471(a).

## II. DISCUSSION

The Commissioner's argument that Treasury Regulation section 1.471-2(d) prohibits the use of shrinkage estimates is foreclosed by our recent decision in <u>Wal-Mart Stores, Inc. & Subsidiaries v. Commissioner</u>, No. 97-2693, slip op. (8th Cir. Aug. 14, 1998). Consequently, the only question remaining is whether the Commissioner abused her discretion in prescribing a new method of accounting for Dayton Hudson.

The general rule for accounting methods provides, "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." I.R.C. § 446(a). Dayton Hudson used the same inventory accounting method for book and tax purposes. Nonetheless, "if the method used does not clearly reflect income," the Commissioner has broad authority to prescribe a method that "does clearly reflect income." I.R.C. § 446(b). In the notice of deficiency issued to Dayton Hudson, the Commissioner prescribed a method that does not account for shrinkage until it has been verified by a physical count. The tax court determined that the Commissioner had acted within her discretion.

We review de novo the tax court's conclusion that the Commissioner acted within her discretion in disallowing Dayton Hudson's method of accounting and prescribing a different method. <u>See</u> <u>Wal-Mart Stores, Inc.</u>, No. 97-2693, slip op. at 13. Nonetheless, we review the tax court's findings of fact for clear error. <u>See</u> <u>id.</u>

The Commissioner's discretion to prescribe a method that clearly reflects income cannot be disturbed unless it is clearly unlawful or plainly arbitrary. <u>See</u> <u>Thor Power Tool Co. v. Commissioner</u>, 439 U.S. 522, 532-33 (1979). The Commissioner may not, however, require a taxpayer to change from an accounting method that reflected income clearly, merely because the Commissioner believes that her method more clearly reflects income. <u>See, e.g.</u>, <u>Louisville and Nashville R.R. v. Commissioner</u>, 641 F.2d 435, 438 (6th Cir. 1981). Likewise, even if the taxpayer's method does not result in a

clear reflection of income, the Commissioner may not change a taxpayer's accounting method to a method that fails to reflect income clearly. See Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Harden v. Commissioner, 223 F.2d 418, 421 (10th Cir. 1955) (holding that when a taxpayer's accounting method fails to reflect income clearly, the Commissioner's only remedy is to prescribe a method that clearly reflects income); Rotolo v. Commissioner, 88 T.C. 1500, 1514 (1987) (stating that "the Commissioner may not require a taxpayer to adopt an accounting method which does not clearly reflect income"). Thus, in order to prevail, Dayton Hudson must show either that its accounting method resulted in a clear reflection of income or that the Commissioner's method does not.

In the absence of a statutory definition of the phrase "clearly reflect income," we turn to the regulations for meaning. Treasury Regulation section 1.446-1(a)(2) states that an accounting method "which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income." Treasury Regulation section 1.471-2(b) further provides that "[i]n order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation." Against this background, we evaluate Dayton Hudson's accounting methods.

## 1. Dayton Hudson's Shrinkage Methods

At the outset, we note that the tax court found, and the Commissioner concedes on appeal, that Dayton Hudson's method of accounting for shrinkage consistently conformed to Generally Accepted Accounting Principles (GAAP) and was in accordance with the best accounting practice in the retail industry. Compliance with GAAP will ordinarily "pass muster for tax purposes," though it does not create a presumption of validity. Thor Power Tool, 439 U.S. at 540.

The method of accounting for shrinkage that Dayton Hudson used at Dayton's differed slightly from what it used at Target. Dayton's directly set its estimated shrinkage rates at the departmental level and Target determined departmental shrinkage rates through a series of calculations. For both divisions, Dayton Hudson injected numerous subjective factors, such as demographics, trends, and changes in security measures, into its method of establishing shrinkage rates. They did not, however, have a discernible method of quantifying these considerations, nor did they even bother keeping all the necessary work papers or documentation with respect to its shrinkage rate determinations. The Commissioner's expert, Dr. David LaRue, testified that Target's method "is predicated on so many subjective processes, that a disinterested party with full knowledge of all relevant data, would not . . . be able to independently reconstruct the forecasted shrinkage derived under this procedure."

Dayton Hudson's method of estimating shrinkage provided its management with a broad range of possible shrinkage rates, unlike the method used by Wal-Mart Stores, Inc., that resulted in a clear reflection of income. See Wal-Mart Stores, Inc., No. 97-2693, slip op. at 13-19. Wal-Mart set shrinkage accrual rates for its existing stores based solely on well documented and objective factors—a three-year rolling average of verified shrinkage.[5] Every year, Wal-Mart determined its estimated shrinkage rates in the same fashion.

Dayton Hudson argues that determining a reasonable shrinkage rate requires the use of judgment because circumstances which are known to affect shrinkage rates are always changing. We neither condemn nor approve the use of judgment in setting shrinkage rates. However, the more a method is laden with considerations left to the

---

[5]To avoid aberrational results, Wal-Mart also applied certain ceiling and floor limitations to its calculated shrinkage rates. See Wal-Mart Stores, Inc., No. 97-2693, slip op. at 6. These limitations were, however, also based on historical shrinkage results. See id.

unbridled discretion of a few individuals, the less conducive it is to consistent application. In the present case, Dayton Hudson's largely undocumented process of ascertaining shrinkage rates entailed so many subjective considerations that consistent application of the process from year-to-year was difficult, if not impossible. See Treas. Reg. § 1.471-2(b) ("greater weight is to be given to consistency" from year-to-year). Consistency, however, is only one component of the clear reflection of income standard.

The standard also includes an accuracy component. See Caldwell v. Commissioner, 202 F.2d 112, 115 (2d Cir. 1953) (stating that "income should be reflected with as much accuracy as standard methods of accounting practice permit"). The tax court found that Dayton Hudson failed to show that its method produced accurate results. We review that factual finding for clear error.

Dayton Hudson's principal expert, Dr. W. Eugene Seago, testified to the accuracy of Target's method. Dr. Seago found a "nearly perfect" statistical correlation between shrinkage and sales at the aggregate division level during the years ending in 1980 through 1989. Due to the absence of the necessary data, he did not conduct a correlation analysis at the departmental or store levels. Next, assuming a perfect correlation between shrinkage and sales, he conducted two analyses showing that Target's method produced accurate results.

The tax court rejected the significance of Dr. Seago's correlation analysis, stating that:

Essentially, Dr. Seago has not persuaded this Court that the strong correlation between sales and shrinkage derived from the 10-year correlation analysis is the product of the true relationship between sales and shrinkage and not the product of the confluence of varying LIFO pool attributes. Dr. Seago has failed to explain that apparently fundamental flaw in the 10-year correlation analysis. That is not to say that we would

-10-

never accept statistical analyses demonstrating a correlation between sales and shrinkage; that is only to say that Dr. Seago, in this case, has simply failed to prove the significance of the correlation derived from the 10-year correlation analysis.

Because the tax court did not accept the statistical correlation between shrinkage and sales, it was equally unpersuaded by Dr. Seago's accuracy analyses, which were dependent on that correlation.

The tax court's finding that Dr. Seago failed to show the significance of his correlation analysis was not clearly erroneous. The record contains statistical evidence showing that the correlation between shrinkage and sales deteriorated at the store and departmental levels, where the degree of correlation, in Dr. Seago's words, is "highly relevant." The Commissioner's expert, Dr. LaRue, also questioned the significance of Dr. Seago's correlation analysis. Although we may have concluded differently, we are not convinced that these findings are clearly erroneous.

After a review of the record and the tax court's factual findings, we conclude that Dayton Hudson did not prove that the Commissioner abused her discretion in finding that its accounting method failed to reflect income clearly. We next turn to whether the method prescribed by the Commissioner results in a clear reflection of income.

## 2.    The Commissioner's Shrinkage Method

We review the tax court's conclusion that the Commissioner's method clearly reflects Dayton Hudson's income de novo. See Wal-Mart Stores, Inc., No. 97- 2693, slip op. at 13.

The Commissioner's method does not account for shrinkage until it is verified by physical count. The Commissioner accounts for shrinkage by reducing the current taxable year's ending inventories by the amount of verified shrinkage from the prior

-11-

physical inventory period. The prior physical inventory period begins with the physical inventory taken in the previous taxable year and concludes with the physical inventory taken in the current taxable year. Because shrinkage occurs in both the physical inventory-to-year-end period and the year-end-to-physical-inventory period, the Commissioner's method includes shrinkage that occurred during two taxable years.

The tax court characterized the Commissioner's method as one that "essentially estimates [year-end] shrinkage for the taxable year based on [year-end] shrinkage for the prior taxable year." This is simply not the case. The method prescribed by the Commissioner does not estimate the current taxable year's stub period shrinkage, it merely delays the inclusion of stub period shrinkage until the following year.

Despite rejecting Dr. Seago's sales-based correlation, the tax court found that shrinkage occurs during the entire year, including the stub period. The Commissioner cannot seriously challenge that finding. Thus, the Commissioner's method always includes goods in ending inventory that were lost due to shrinkage during the stub period. For example, if Target suffered $65 million in shrinkage during the physical inventory period that ended in year 2, a significant portion of that shrinkage surely occurred during the stub period of year 1. Under the Commissioner's method, that stub period shrinkage is not accounted for on Dayton Hudson's year 1 tax return, and thus the ending inventory on the year 1 tax return includes goods that are no longer in inventory. On the year 2 tax return, the Commissioner's method includes year 1 stub period shrinkage and the shrinkage from the beginning of year 2 to the last physical inventory, while ignoring year 2 stub period shrinkage. Thus, the Commissioner's method does not even attempt to reflect the shrinkage that occurred during the taxable year.

Rather than propose her own method of estimating the stub period shrinkage, the Commissioner has instead adopted a method that does not account at all for the shrinkage that occurred during the stub period, penalizing those taxpayers that did not

conduct a physical inventory at year-end. The Commissioner argues that her method is proper because verification is an essential aspect of inventory accounting. However, we have previously held that by permitting cycle counting, the Commissioner has "opened the door to the industry practice of estimating shrinkage." Wal-Mart Stores, Inc., No. 97- 2693, slip op. at 10. Dayton Hudson has an abundance of inventory records and data, including historical shrinkage experiences, such that the Commissioner could have constructed a method of accounting for shrinkage during the stub period. Moreover, for businesses, such as Target, that are opening new stores every year, the Commissioner's method is particularly distortive because the initial stub period at a new store tends to be longer than that of an existing store. Finding no basis in law or fact for the Commissioner's method, we hold that Dayton Hudson has shown that the Commissioner's method does not reflect income clearly and is plainly arbitrary. See Thor Power Tool, 439 U.S. at 533.

Congress apparently had the same trepidations about the Commissioner's method. In enacting I.R.C. § 471(b), Congress stated, "Where physical inventories are not taken at [year-end], the Committee believes that income will be more clearly reflected if the taxpayer makes a reasonable estimate of the shrinkage occurring through [year-end], rather than simply ignoring it." H.R. Rep. No. 105-148, at 409 (1997); S. Rep. No. 105-33, at 231 (1997).

The Commissioner argues that by rejecting her method, we are declaring that any inventory method that does not estimate stub period shrinkage fails to reflect income clearly. This is simply not the case. The Code provides that if the Commissioner desires to prescribe an alternative accounting method, that method must clearly reflect the taxpayer's income. See I.R.C. § 446(b). Here, we simply hold that the method prescribed for Dayton Hudson does not result in a clear reflection of income. We express no opinion on the accounting methods of other taxpayers.

## III. CONCLUSION

We find no error in the tax court's conclusion that Dayton Hudson's method of accounting for shrinkage did not reflect income clearly. However, we find that the Commissioner acted arbitrarily in prescribing a different method that does not reflect income clearly. Accordingly, the judgment of the tax court is reversed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.